UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
TONY COUNCIL,
                                  :
            Petitioner,              REPORT & RECOMMENDATION
                                  :            and
         -against-                   MEMORANDUM & ORDER
                                  :
SUPERINTENDENT MICHAEL CAPRA,        14 cv. 1849 (PKC)(MHD)
                                  :
            Respondent.
------------------------------x

TO THE HONORABLE P. KEVIN CASTEL, U.S.D.J.:


    Pro se petitioner Tony Council seeks a writ of habeas corpus
to challenge his 2007 judgment of conviction on two counts of
first-degree criminal sale of a controlled substance and one count
of second-degree conspiracy to distribute crack cocaine. Petitioner
was convicted following a jury trial in the New York State Supreme
Court, New York County, and was sentenced by presiding Justice
Bonnie G. Wittner to consecutive terms of 15 years to life on the
sale counts and a concurrent term of 8 1/3 to 25 years on the
conspiracy count.


    Petitioner presses five grounds to set aside his conviction or
sentence. First, he argues that the State failed to prove his guilt
beyond a reasonable doubt on at least the two sale counts, and
possibly the conspiracy charge. Second, he complains that the trial

court discharged one juror without giving defense counsel an adequate opportunity to be heard. Third, he asserts that the trial judge denied him a fair trial by questioning the jury foreperson on three occasions about her conduct or fitness to serve. Fourth, he complains about a pre-trial ruling that declined to sever several murder counts against one of the other defendants on trial. Finally, he insists that his sentence was so severe as to constitute cruel and unusual punishment.

Respondent of course opposes. He argues that one of the evidentiary-sufficiency claims is procedurally barred and that the other two are unexhausted and should also be deemed procedurally barred. Alternatively, he says, these claims are groundless. As for the attack on the discharge of a juror, respondent asserts that the claim is barred and in any event neither cognizable nor substantively sustainable. The remaining three claims, he argues, are meritless.

Apart from the merits or demerits of petitioner's claims, Council has applied for an order staying this proceeding while he pursues a section 440.10 motion in state court to vacate his conviction and sentence on other grounds. Respondent opposes, contending that he has not demonstrated good cause for his failure

2

to exhaust his state-court remedies before pursuing habeas relief. He also asserts that any amendment of the petition after exhaustion would be futile.

For the reasons that follow, we find that all of the petitioner's claims are either procedurally barred or meritless or both, and we therefore recommend that the writ be denied. As for the stay motion, we deny it in the absence of any showing of good cause.

I. <u>Prior Proceedings</u>

Petitioner's convictions stemmed from his participation in a drug-trafficking organization that operated in the vicinity of the Frederick Douglass housing project in northern Manhattan. The gang engaged in street-level sales of crack cocaine, and some of the participants in the group also committed acts of violence, including several murders, during the period from 1999 to 2005. These activities led to a police undercover investigation, on the basis of which a grand jury returned a 32-count indictment on March 13, 2006 charging 18 defendants, including petitioner, with various crimes related to the distribution of narcotics. (State Br. 1-2).

At least eleven of the named defendants pled guilty to a variety of charges. (Id. 3 n.1). Five of the remaining defendants were tried together, including petitioner. These defendants included Al Javier, described in the indictment as a co-leader of the organization with petitioner; Michael Wilson; Tyrone Council, reportedly petitioner's nephew; and Ramon Pequero, described as the "enforcer" of the organization. (Id. 1-2).

The indictment charged all defendants with second-degree conspiracy. It also charged petitioner and Javier jointly with two counts of criminal sale in the first degree, relating to sales of crack cocaine made on September 27, 2004 and January 12, 2005. (Id. 2). The indictment also charged Javier, in five additional counts, with other drug sales, and it charged Pequero with two counts of murder[1], single counts of attempted murder, assault and burglary and three counts of weapon possession. (Id.; Deft's Br. 3-4).[2]

Before trial, petitioner moved to sever the homicide counts

_____

[1] One of the counts charged first-degree murder based on the premise that the killing had been in connection with a burglary. (Tr. 3818-21). In connection with that charge, the jury was also given a lesser-included charge of second-degree murder for that homicide. (Tr. 3821-24).

[2] Prior to trial, eleven of the defendants pled guilty to various levels of conspiracy or drug sales. (State Br. at 3 n.1).

from his case. On July 25, 2006 the Hon. Charles H. Solomon denied that motion. (Id. 2; Deft's Br. 4).

Trial commenced on November 6, 2006. On December 18, 2006 the jury convicted Council on all three counts against him. (Tr. 3971-72). At the same time the jury convicted Javier on seven counts of criminal sale and on the conspiracy count, and convicted Tyrone Council and Michael Wilson of conspiracy. (Tr. 3969-71, 3972-76). One day later, the jury convicted Pequero of two counts of second-degree murder, one count of attempted second-degree murder, one count of first-degree burglary, one count of second-degree conspiracy, three counts of second-degree criminal possession of a weapon, and three counts of third-degree weapon possession. (Tr. 3993-97).[3]

On February 8, 2007[4] Justice Wittner sentenced Council to two consecutive prison terms of 15 years to life on the sale convictions, and a concurrent term of 8 1/3 to 25 years on the conspiracy conviction. These sentences were to be served

---

[3] The jury acquitted Pequero of one count of first-degree murder. (Tr. 3993).

[4] Respondent states that the sentencing took place on January 12, 2007. (State Br. at 3; Resp. Br. at 16-17). The dating is immaterial to the disposition of the petition.

concurrently with a prior sentence of four to twelve years that had been imposed following a separate conviction of Council for a single criminal sale of cocaine that was in furtherance of the same conspiracy.[5] (Deft's Br. 23; State Br. 75).[6]

Council's trial attorney did not file a notice of appeal from the judgment of conviction, apparently in breach of a representation to his client that he would do so. (Deft's Br. 1 n.2). In 2009 petitioner filed a <u>coram</u> <u>nobis</u> application in the Appellate Division, seeking leave to file an out-of-time appeal from his conviction. The Appellate Division denied the application, but the New York Court of Appeals reversed and authorized the appeal. <u>People</u> <u>v. Syville</u>, 15 N.Y.3d 391, 396-402, 912 N.Y.S.2d 477, 480-84 (2010).

Petitioner then filed an appeal with the First Department, in the course of which he pursued four grounds for relief. First, he argued that the evidence was insufficient to justify his conviction

---

[5] <u>See</u> <u>People v. Council</u>, 41 A.D.3d 313, 837 N.Y.S.2d 565 (1st Dep't 2007), <u>leave denied</u>, 9 N.Y.3d 960 (2009).

[6] As for petitioner's co-defendants, Javier was sentenced to 40 years to life; Pequero received a term of 50 years to life; Wilson was given a term of seven to 21 years; and Tyrone Council was sentenced to six to twelve years. (State Br. 3 n.1). These defendants, except for Javier, appealed and their convictions were affirmed. (<u>Id.</u>).

on the January 12, 2005 sale and that this conviction was against the weight of the evidence. (Deft's Br. 24-30).[7] Second, he argued that the trial judge had committed reversible error by (1) discharging a juror without allowing defendant's attorney to be heard and (2) repeatedly questioning the foreperson in an assertedly intimidating manner. (Id. 30-41). Third, he complained about the joinder of the murder and attempted-murder counts against Pequero with the narcotics charges against Council. (Id. 41-49). Finally, he asserted that his sentence was "excessive and should be reduced" and further argued that it amounted to retaliation for his insistence on going to trial before a jury. (Id. 49-57).

On September 27, 2012 the Appellate Division affirmed the conviction and sentence. People v. Council, 98 A.D.3d 917, 951 N.Y.S.2d 149 (1st Dep't 2012). In doing so, it held that Council had failed to preserve his objection to the sufficiency of the evidence and stated that it would decline to review the claim in the interest of justice. Alternatively, it observed that the evidence was adequate to justify the challenged sale conviction and that the

---

[7] Recognizing that Council's trial attorney had not moved to dismiss this charge at trial, Council argued in his appellate brief that the Appellate Division should nonetheless reach the issue because the failure to preserve the claim amounted to ineffective assistance of counsel. (Deft's Br. at 26-27).

conviction was not against the weight of the evidence. Id. at 917-18, 951 N.Y.S.2d at 150. The panel next approved of the denial of the defendant's severance motion, since the charged conduct of his co-defendants was "necessary to prove conspiracy." Id. at 918, 951 N.Y.S.2d at 150. The court also rejected as meritless Council's complaint about the trial judge's questioning of the foreperson, noting that each of the judge's three inquiries was a legitimate step to deal with three separate issues, and that the defendant had not been prejudiced. Id. at 918, 951 N.Y.S.2d at 150-51. As for any additional issues raised by Council about the questioning of the foreperson and the discharge of another juror, the court held that they were unpreserved, and it declined to address them in the interest of justice; alternatively, it deemed the arguments either meritless or insufficient to justify reversal. Id. at 918, 951 N.Y.S.2d at 151. Finally, the court found no error in the sentencing. Id. at 918, 951 N.Y.S.2d at 151.

Petitioner sought leave to appeal to the New York Court of Appeals. In doing so he raised the same arguments as he had pursued in his direct appeal. (Rudin Oct. 12, 2012 letter at 1-2; see also Rudin letter dated Nov. 26, 2012). In addition, however, he argued, as a separate theory for reversal, that he had been denied the effective assistance of trial counsel because the attorney had not

8

moved to dismiss the sale charge pertaining to the January 2005 transaction based on a claim of evidentiary insufficiency. (Rudin Oct. 12 letter at 2). By follow-up letter dated November 26, 2012, Council's attorney addressed only the issues pertaining to the discharge of the one juror. (Rudin Nov. 26 letter). The State opposed the application (Marinelli Dec. 3, 2012 letter), and Council's attorney replied. (Rudin Dec. 5, 2012 letter). The Court of Appeals denied leave to appeal by order dated February 25, 2013. People v. Council, 20 N.Y.3d 1060, 962 N.Y.S.2d 611 (2013).

Petitioner next turned to this court, seeking habeas corpus relief. He dated his petition February 25, 2014 (Pet. at page 16), and we infer that he provided it to his jailers the same day. See, e.g., Fernandez v. Artuz, 402 F.3d 111, 113-14 (2d Cir. 2005); Peralta v. Connelly, 2008 WL 805071, *7 n.16 (S.D.N.Y. April 18, 2008). In that petition he asserted in large measure the same claims as his attorney had pursued before the Appellate Division. (Pet. at 1-4, 27-32). In addition, he engaged in arguments to the effect that the prosecutors had knowingly presented false testimony and doctored evidence in the form of a videotape of a drug sale in which he appeared. (E.g., Pet. at 2, 4). He subsequently proffered to this court a December 5, 2013 report purportedly prepared by Owen Forensic Services, LLC, a forensics laboratory, in which the

examiner concluded that a DVD submitted by petitioner to the laboratory -- impliedly a copy of a September 27, 2004 video of a drug sale used by the State at trial -- had been altered by deletions of a portion of the recording. (June 23, 2014 letter from Tony Council & attachment).

Following the filing by respondent of his opposition in August 2014, petitioner filed a "Traverse" dated August 28, 2014, in the course of which he (1) argued that he was actually innocent and (2) asserted that his habeas petition implicitly includes a claim for ineffective assistance of counsel and asked to amend the petition to add such a claim. (Traverse at 2, 4-7, 7-9). He also noted that he was preparing a section 440.10 motion to file in state court and requested that as soon as he completed the 440.10 motion -- apparently intended to assert "ineffective assistance of [trial] counsel, prosecutorial misconduct, actual innocence etc." -- this court should hold his habeas petition in abeyance. (Pet. at 9).

Shortly thereafter, by letter dated September 13, 2014, petitioner provided the court a copy of the 440.10 motion that he said he had just filed with the New York State Supreme Court, seeking to vacate his conviction on various new grounds -- including "actual innocence" and ineffective assistance of counsel -- and in

10

his letter to this court he again asked that this proceeding be held in abeyance to permit him to pursue his additional claims in state court.[8] Respondent has opposed that application. (Fleischmann Oct. 8, 2014 letter).

Finally, in a series of letters to this court, petitioner insisted not only that he was actually innocent of one of the sales for which he was convicted -- the sale that occurred on September 27, 2004 -- but that at least one witness who testified to that sale -- an individual named Freddie Knox -- was now willing to so state. (Oct. 19, 2014 Council letter; Council Suppl. Decl. Dated Oct. 27, 2014). That said, in a more recent letter to the court, petitioner reports that Mr. Knox is no longer willing to recant his trial testimony. (Council March 14, 2015 letter). In the same letter he also confirms that his 440.10 motion was finally filed in state court. (Id.).

II. ANALYSIS

We first briefly address petitioner's stay application, which

---

[8] In a subsequent letter to the court petitioner advised that the State Supreme Court had not received his 440.10 motion assertedly sent to it in September 2014. (Council Jan. 3, 201[5] letter). Apparently the motion was subsequently served and filed.

we deny, and then turn to the claims that his petition currently asserts.[9]

    A. <u>The Stay Motion</u>

    As noted, petitioner asks this court to stay his habeas proceeding in deference to a 440.10 motion dated September 18, 2014 that he filed in the New York State Supreme Court. (<u>See</u> Doc. # 18). By that motion he (1) asserts what he describes as an "actual innocence" defense based on "newly discovered evidence", (2) claims that he was denied effective assistance of trial counsel because his lawyer did not challenge surveillance evidence used by the State and did not complain of the State's spoliation of evidence, and because he did not seek to dismiss the January 2005 sale charge, (3) asks for a reduction of his sentence based on amendments to the State's drug laws, and (4) asserts that the State concealed exculpatory

---

[9] Contrary to Council's assertion, his petition does not include a Sixth Amendment claim for denial of effective assistance of trial counsel. (Pet. at 1-4, 27-32). He does allude at one point in his Traverse to his attorney's asserted failing in not moving to dismiss one or both of the sale counts for lack of evidence (Traverse at p. 3), an argument designed to show cause to excuse his procedural default of that evidentiary-insufficiency claim. (<u>Id.</u>). As we note below, <u>infra</u> pp. 21-39, even if this reference were deemed to be a separate Sixth Amendment claim, it could not survive procedural or merits scrutiny.

evidence, in violation of the prosecutors' obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and spoliated surveillance evidence. (<u>Id.</u> at pp. 16, 31-49). We understand that this motion is still <u>sub judice</u> before the New York Supreme Court.

To justify staying a habeas proceeding to permit a return to state court to exhaust a claim that may thereafter be added to a habeas petition, the petitioner must demonstrate what the Supreme Court has descried as "good cause" for his failure to exhaust that claim before filing his initial petition. <u>See Rhines v. Weber</u>, 544 U.S. 269, 277-78 (2005). He must also show that the claim in question is not "plainly meritless" and that he has acted diligently. <u>Id.</u>

Neither the Supreme Court nor the Second Circuit has defined "good cause" in this context, but lower courts that have addressed the question typically require that "some factor external to the petitioner give rise to his failure to assert the claims in state court." <u>Corbin v. Perez</u>, 2015 WL 3972252, *3 (S.D.N.Y. June 26,. 2015)(quoting <u>Williams v. Marshall</u>, 2011 WL 1334849, *2 (S.D.N.Y. March 30, 2011)). <u>Accord Rios v. Bradt</u>, 2015 WL 459284, *2 (E.D.N.Y. Feb. 2, 2015)(citing cases); <u>Whitley v. Ercole</u>, 509 F. Supp.2d 410,

417 (S.D.N.Y. 2007).[10]

Petitioner fails to demonstrate good cause, however construed. His apparent theory for excusing his tardiness is the asserted fact that he submitted a DVD to a forensic laboratory long after his trial, and indeed after his state-court appeal had been filed, and the laboratory issued a report stating that the DVD was a copy from which portions of the original had been deleted. (Council June 23 letter, attachment at pp. 1, 8-10). Putting to one side the problem that there is no identification of the DVD that was assessed by the laboratory, which would be necessary to link it -- as petitioner implies -- to a piece of evidence used at the trial,[11] the laboratory report is dated December 5, 2013, more than two months before petitioner filed his current habeas petition. Accordingly,

---

[10] A few courts have used a "more lenient" standard, that requires the petitioner to demonstrate "reasonable confusion" concerning state laws and procedures. See Williams, 2011 WL 1334849 at *2 (citing cases). In this case, petitioner does not attempt to demonstrate such "confusion".

[11] The DVD was apparently supplied to the laboratory by petitioner's counsel, with instructions to send the report to Council. (Id. at 6). The report notes that the disk was prepared on December 20, 2011, although the events portrayed apparently took place on September 27, 2004. (Id. at 1). The report also recites that the DVD that the laboratory received was a copy of an original and had various deletions from the original (id. at 8-10), but there is no indication whether the deletions were from the prosecutor's original or from the copy.

14

petitioner was in possession of this information well before the deadline for filing the habeas petition -- which was May 27, 2014 -- and petitioner therefore had sufficient time to proceed with his 440.10 motion before filing the habeas petition.[12] In any event, petitioner offers no justification for the delay in providing the DVD to the forensic firm in view of his contention that the video used at his 2006 trial plainly reflected tampering or editing. (E.g., 440.10 Motion at 3-4 (video did not show transaction, only events leading to it), 39 (petitioner recognized video as "as a fabrication" as soon as he first saw it).[13]

Finally, the forensic report affects only those claims in the 440.10 motion that pertain to Council's assertions that the State

---

[12] The habeas one-year statute of limitations would normally not have expired until May 27, 2014 -- one year and 90 days after the New York Court of Appeals denied Council leave to appeal from the affirmance of his conviction and sentence. See, e.g., Pratt v. Greiner, 306 F.3d 1190, 1195 n.1 (2d Cir. 2002). In any event, the filing of a section 440.10 motion would have tolled the limitations period until final adjudication of that motion by the state courts. 28 U.S.C. § 2244(d)(2). See, e.g., Saunders v. Senkowski, 587 F.3d 543, 548 (2d Cir. 2009).

[13] Petitioner at least partly contradicts his own assertion that the transaction was not portrayed. (See 440.10 Motion at 14 (video showed Council handing money to two women). He also falsely represents that the Owen report states that the image of Freddy Knox "was superimposed on the copy of" the DVD. (440.10 Motion at 31). The report states only that various segments of the Original DVD had been deleted. (Report at 8-10).

15

had withheld or spoliated pertinent evidence, and it does not affect the balance of the arguments that he presses in the State court. Accordingly, he fails to demonstrate good cause for not pursuing his other 440.10 claims in the Supreme Court before seeking habeas relief and equally fails to demonstrate the requisite due diligence.

As courts have noted, "'"[s]tay and abeyance should be available only in limited circumstances" so as not to undermine the "twin purposes" of the federal habeas statute: "encouraging finality" and "streamlining federal habeas proceedings . . . ."'" Corwin, 2015 WL 3972252 at *3 (quoting Holquin v. Lee, 2013 WL 3344070, *2 (S.D.N.Y. July 2, 2013)(quoting Rhines, 544 U.S. at 277)). This is plainly not such a case.[14]

_____

[14] In view of petitioner's failure to demonstrate good cause, we need not assess respondent's further argument that at least some of the claims embodied in his 440.10 motion (notably his claim of ineffective trial counsel) -- if asserted here -- would be time-barred under 28 U.S.C. § 2244(d). We do note, however, that to the extent that he asserts a claim of "actual innocence" on his section 440.10 motion, invocation of such a claim here would fail, if for no other reason, because it "'is not a free-standing cognizable ground for habeas relief.'" Sutton v. Graham, 2012 WL 4103884, *4 (N.D.N.Y. Sept. 17, 2012)(quoting Russell v. Rock, 2008 WL 5333327, *5 (E.D.N.Y. Dec. 19, 2018). See, e.g., Johnson v. Bellnier, 508 F. Appx. 23, 25-26 (2d Cir. Jan. 25, 2013)(quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)); Rivas v. Fischer, 687 F.3d 514, 540 & n.34 (2d Cir. 2012).

16

B. Assessment of Petitioner's Current Habeas Claims

Before we consider each of petitioner's current claims, we briefly summarize the general standards for review by habeas courts of the merits-based decisions of the state courts.

1. Review Standards

The stringency of federal habeas review turns on whether the state courts have passed on the merits of a petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see, e.g., Harrington v. Richter, 562 U.S. 86,

97-98 (2011); <u>Bell v. Cone</u>, 535 U.S. 685, 693-94 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring); <u>Besser v. Walsh</u>, 601 F.3d 163, 178 (2d Cir. 2010), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>sub</u> <u>nom.</u> <u>Portalatin v. Graham</u>, 624 F.3d 69 (2d Cir. 2010) (<u>en</u> <u>banc</u>); <u>Howard v. Walker</u>, 406 F.3d 114, 121-22 (2d Cir. 2005); <u>Brown v. Artuz</u>, 283 F.3d 492, 498 (2d Cir. 2002).

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" <u>Howard</u>, 406 F.3d at 122 (quoting <u>Kennaugh v. Miller</u>, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" <u>Howard</u>, 406 F.3d at 122 (quoting <u>Williams</u>, 529 U.S. at 413); <u>see</u> <u>also</u> <u>Marshall v. Rodgers</u>, 133 S.Ct 1446, 1448 (2013).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the 'relevant state-court decision applied clearly established federal law

erroneously or incorrectly.'" <u>Howard</u>, 406 F.3d at 122 (quoting <u>Fuller v. Gorczyk</u>, 273 F.3d 212, 219 (2d Cir. 2001)). The Supreme Court observed in <u>Williams</u> that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [but] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410–13. As implied by this language, "'[s]ome increment of incorrectness beyond error is required ... [H]owever ... the increment need not be great; otherwise habeas relief would be limited to state court decisions "so far off the mark as to suggest judicial incompetence."'" <u>Monroe v. Kuhlman</u>, 433 F.3d 236, 246 (2d Cir. 2006) (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000)); <u>accord</u> <u>Richard S. v. Carpinello</u>, 589 F.3d 75, 80 (2d Cir. 2009).

Under the Supreme Court's more recent, and arguably more stringent, interpretation of the statutory language, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington</u>, 562 U.S. at 101 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported the state court's

decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an 'unreasonable' application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. "As Harrington bluntly states, '[i]f this standard is difficult to meet, that is because it was meant to be.'" Young v. Conway, 715 F.3d 79, 98 (2d Cir. 2013) (quoting Harrington, 562 U.S. at 102.

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 589 F.3d at 80-81;

20

McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see also Rice
Collins, 546 U.S. 333, 338–39 (2006).


    2. Evidentiary Sufficiency: the January 2005 Sale


    Petitioner complains, as he did on his direct appeal, that the
evidence of his involvement in a narcotics sale on January 12, 2005
was insufficient to justify his conviction. Respondent argues that
this claim is procedurally barred and meritless. We agree.


    A. Procedural Bar


    Petitioner's counsel did not move at trial to dismiss this
charge for lack of evidence and indeed Council conceded as much on
appeal. (Deft's Br. at 24, 26).[15] In responding to Council's
argument on this issue on appeal, the State asserted that Council
had failed to preserve the issue because of his attorney's silence
at trial, in violation of the requirement of N.Y. Crim. Proc. L. §
470.05 that a defendant voice a contemporaneous objection in order

---

    [15] In Council's appellate brief his attorney suggested that
the conviction could still be set aside as against the weight of
the evidence. (Id. at 24). Alternatively, he suggested that the
Court could reach the insufficiency claim on the basis that the
failure of trial counsel to assert that argument amounted to
ineffective assistance. (Id. at 26).

to preserve a challenge to the conduct of a trial. (State's Br. at 24 (citing People v. Gray, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 175 (1995)). The panel ultimately deemed the claim unpreserved and declined to address it in the interest of justice. Council, 98 A.D.3d at 917-18, 951 N.Y.S.2d at 150. This scenario requires the application of procedural-bar analysis, and that analysis dictates that the claim is procedurally barred from review.

  (i). Procedural Bar Criteria

  If the highest state court to address a federal-law claim disposes of it on a "state-law ground that is 'independent of the federal question and adequate to support the judgment,'" a federal habeas court may not review that claim unless the petitioner demonstrates both cause for his default and prejudice or else establishes that a failure to address the claim would constitute a fundamental miscarriage of justice. See, e.g., Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)); see also Jimenez v. Walker, 458 F.3d 130, 138-40 (2d Cir. 2006) (citing Harris v. Reed, 489 U.S. 255 (1989)). A state procedural rule can qualify as an adequate and independent state-law ground. See Harris, 489 U.S. at 260-61.

To be independent, the state-law holding must rest on state law that is not "'interwoven with the federal law.'" Jimenez, 458 F.3d at 137 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). Since it can be "'difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference,'... reliance on state law must be 'clear from the face of the opinion.'" Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000) (quoting Coleman, 501 U.S. at 732, 735). When determining whether we may entertain a claim, we "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000)).

In this regard, even if the appellate court rejects the claim as unpreserved and then, in the alternative, notes that if it had reviewed the merits it would have rejected the claim, the ruling is deemed, for this purpose, to have rested on the state-law procedural ground. See Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) ("Even where the state court has ruled on the merits of a federal claim 'in the alternative,' federal habeas review is foreclosed where the state court has also expressly relied on the petitioner's procedural

default.") (citation omitted); <u>Green v. Travis</u>, 414 F.3d 288, 294 (2d Cir. 2005); <u>see also</u> <u>Bell v. Miller</u>, 500 F.3d 149, 155 (2d Cir. 2007) (state court's "contingent observation" is not an "adjudication on the merits" for purposes of habeas review).

As for the requirement of adequacy, the state procedural rule must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." <u>Murden</u>, 497 F.3d at 192 (quoting <u>Monroe</u>, 433 F.3d at 241); <u>see also</u> <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002); <u>Cotto v. Herbert</u>, 331 F.3d 217, 239 (2d Cir. 2003) (citing <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999)). However, principles of comity caution against categorizing a state procedural rule as inadequate "lightly or without clear support in state law." <u>Garcia</u>, 188 F.3d at 77 (internal quotation marks omitted).

Once a respondent has demonstrated that the state court relied on an independent and adequate ground, it is incumbent upon the petitioner to meet one of two recognized exceptions. <u>Coleman</u>, 501 U.S. at 750. Under procedural-bar rules, we may not review the merits of the claim unless petitioner can overcome his procedural default by either "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or

24

[establishing] ... that failure to consider the claims will result in a fundamental miscarriage of justice." Id.; see also Fama, 235 F.3d at 809.

To demonstrate cause, petitioner must establish that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," for example, by showing that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials ... made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (citing Reed v. Ross, 468 U.S. 1, 16 (1984) and quoting Brown v. Allen, 344 U.S. 443, 486 (1953)). A petitioner may also satisfy the cause requirement by demonstrating that the failure of his attorney to comply with state procedural rules denied him constitutionally adequate representation. See Restrepo v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999). He cannot invoke this ground, however, unless he first asserted an equivalent independent Sixth Amendment claim in state court and exhausted his state-court remedies with respect to that claim. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000). In any event, it bears emphasis that "[a] defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the

25

level of a violation of a defendant's Sixth Amendment right to counsel." Aparicio v. Artuz, 269 F.3d 78, 91 (2d Cir. 2001); see also Edwards, 529 U.S. at 451.

To demonstrate prejudice, a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original); see, e.g., Rodriquez v. Mitchell, 252 F.3d 191, 203-04 (2d Cir. 2001).

The second exception -- that failure to review petitioner's claims would result in a fundamental miscarriage of justice -- is reserved for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496; accord Sawyer v. Whitley, 505 U.S. 333, 339 n.6 (1992). To establish "actual innocence," petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley v. United States, 523 U.S. 614, 623 (1998) (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)) (internal quotation marks omitted). In this context, "actual

26

innocence means factual innocence, not mere legal insufficiency." Bousley, 513 U.S. at 623. Furthermore, the petitioner must support his claim "'with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.'" Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004) (quoting Schlup, 513 U.S. at 324); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002).


### (ii). Procedural Bar Assessment


Under N.Y. Crim. Proc. L. § 470.05, petitioner's failure to move at trial on the ground that he now asserts in his habeas petition -- that the evidence of the January 12, 2005 drug sale was insufficient to prove his guilt -- amounts to a lack of preservation, which ordinarily will preclude the state appellate courts from addressing the claim on its merits. Moreover, that rule has been applied with some consistency to require a "specifically directed" motion for dismissal of the indictment in the event that the defendant believes the evidence to have been insufficient to prove guilt beyond a reasonable doubt. See, e.g., People v. Hawkins, 11 N.Y.3d 484, 491-93, 872 N.Y.S.2d 3995, 398-400 (2008); Gray, 86 N.Y.2d at 18-22, 629 N.Y.S.2d at 175-77; cf. People v. Finch, 23

27

N.Y.3d 408, 413-16, 991 N.Y.S.2d 552, 555-58 (2014).

In this case petitioner conceded on appeal that his trial attorney had never moved to dismiss the count charging the January 12, 2005 sale.[16] Not surprisingly, then, the Appellate Division explicitly found the evidentiary-insufficiency claim to be unpreserved, and it declined to review it in the interest of justice. Council, 98 A.D.3d at 917-18, 951 N.Y.S.2d at 150. Such reliance on the contemporaneous-objection rule constitutes an independent state-law ground that presumptively bars habeas review by this court. See, e.g., Gutierrez v. Smith, 702 F.3d. 103, 111 (2d Cir. 2012) (quoting Peterson v. Scully, 896 F.2d 661, 663 (2d Cir.

---

[16] Petitioner's appellate counsel asked that the Appellate Division reverse on the alternative basis that the conviction was against the weight of the evidence -- an argument that did not require trial-level preservation. (Deft's Br. at 24). Given this mode of argument on the appeal, one might fairly suggest that the claim of evidentiary insufficiency is unpreserved in the face of the statutory exhaustion requirement, see 28 U.S.C. § 2254(b)(1), since defendant explicitly foreswore the constitutional argument in favor of the state-law theory. See, e.g., Williams v. Marshall, 2011 WL 2175810, *9 (S.D.N.Y. March 30, 2011)(argument directed solely to weight of the evidence did not exhaust with respect to constitutional insufficiency argument). Nonetheless, that conclusion would not alter our analysis because, even if the claim were deemed unexhausted, petitioner would have no currently available state-court remedy, see, e.g., Jimenez, 458 F.3d at 149; Artuz v. Bennett, 531 U.S. 4, 10-11 (2000)(discussing N.Y. Crim. Proc. L § 440.10(2)(a)), and accordingly the claim would have to be subjected to procedural-bar analysis. See, e.g., McKethan v. Mantello, 292 F.3d 119, 122 (2d Cir. 2002).

1990)(citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 86–87 (1977))); <u>see also Kozlowski v. Hulihan</u>, 511 F. App'x 21, 25 (2d Cir. 2013). Furthermore, the New York courts consistently enforce this rule of non-preservation when the defendant has failed to move with specificity to dismiss on the basis of evidentiary inadequacy, as well as when the defendant makes a general objection without specifying the specific grounds of the alleged error. <u>See</u>, <u>e.g.</u>, <u>Hawkins</u>, 11 N.Y.3d at 491–93, 872 N.Y.S.2d at 398–400; <u>Gray</u>, 86 N.Y.2d at 18–22, 629 N.Y.2d at 175–77; <u>accord</u>, <u>e.g.</u>, <u>People v. Daryl H.</u>, 21 N.Y.3d 708, 715, 977 N.Y.S.2d 672, 675–76 (2013). <u>See also Garvey v. Duncan</u>, 485 F.3d 709, 715 (2d Cir. 2007) ("New York courts consistently interpret § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error.") (citing <u>People v. McLane</u>, 256 A.D.2d 10, 10, 68 N.Y.S.2d 24 (1st Dep't 1998)); <u>People v. Jackson</u>, 76 N.Y.2d 908, 909, 563 N.Y.S.2d 42, 43 (1990).

Petitioner, faced with the necessity to establish either cause and prejudice or a fundamental miscarriage of justice, does neither. At a certain point he seeks to excuse the procedural default in the trial court based on the contention that his attorney's failure to challenge the second charge of a criminal sale was so incompetent

as to amount to constitutionally ineffective assistance of counsel and thus constitutes "cause". (Traverse at p. 3). This effort fails at several levels.

As noted, to invoke a Sixth Amendment claim as cause, the petitioner must first have asserted such a claim in state court and exhausted his state-court remedies with respect to it. Petitioner has not done so. Although he alluded in passing to such a theory on his direct appeal (Deft's Br. at 26-27), the State pointed out that an ineffective-assistance claim of this sort should first be raised in a section 440.10 motion in the trial court, which petitioner at that time had not done (State Br. at 24-25 (citing People v. Rivera, 71 N.Y.2d 705, 709, 530 N.Y.S.2d 52, 54-55 (1988)), and the Appellate Division never alluded to this being an independent claim, a conclusion that is consistent with New York procedural law. See, e.g., Rivera, 71 N.Y.2d 705, 709, 530 N.Y.S.2d at 54-55; People v. Zeh, 289 A.D.2d 692, 695, 734 N.Y.S.2d 306-08 (3d Dep't 2001); see also People v. Barnes, 106 A.D.3d 600, 604-05, 965 N.Y.S.2d 488, 492-93 (1st Dep't 2013)("rare" case in which Sixth Amendment claim can be assessed on direct appeal). Not surprisingly, then, petitioner has now asserted this very claim in his pending 440.10 motion (440.10 Motion at 40-41), and thus, necessarily, has not exhausted that claim in state court. Hence it cannot serve as cause.

30

In any event, petitioner could not demonstrate a viable Sixth Amendment claim premised on his trial attorney's declination to attack the grounding of the January 2005 sale count. As we note below in assessing the merits of this claim, the evidence presented at trial sufficed to permit the jury to find not only that petitioner was a key participant in the narcotics business of the drug-trafficking organization, but that he was present at the January 12, 2005 sale to provide back-up for co-defendant Javier, as Javier made a sale to an undercover agent in circumstances reflecting that Javier was very mistrustful of the buyer and particularly the buyer's accompanying "bodyguard". See pp. 34-35, infra. Since petitioner's theory of evidentiary insufficiency is plainly meritless, he cannot demonstrate that his trial attorney's failure to press such a losing argument was either professionally deficient or prejudicial to him, both of which are required elements for a successful Sixth Amendment claim. See, e.g., Hicks v. Ercole, 2015 WL 1266800, *23 (S.D.N.Y. March 18, 2015)(quoting United States v. Regalado, 518 F.3d 143, 150 n.3 (2d Cir. 2008)(quoting United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999)).

As for the alternative escape hatch from a procedural default, petitioner cannot demonstrate that a failure to address the merits of this evidentiary-insufficiency claim would constitute a

fundamental miscarriage of justice. Although he repeatedly asserts that he is "actually innocent", he fails to proffer any new evidence of innocence, and the evidence at trial was certainly ample to justify his conviction on this sale count.

All that petitioner does allude to is the forensic report that was prepared in late 2013 concerning the status of a DVD apparently copied from the prosecutor's video, but even petitioner does not suggest that this video concerned the January 2005 sale -- indeed, it evidently pertained to the September 27, 2004 sale (see Report at 1 (referring to DVD as "September 27, 2004 Video")) -- and in any event the report itself does not suggest, much less demonstrate, innocence of the January 2005 sale charge or indeed of any other charge.[17] In short, petitioner cannot satisfy the demanding requirements for showing that no reasonable juror would have voted to convict him in light of newly presented evidence.

3. Merits

Even if we were to reach the merits of petitioner's claim, it would fail. To sustain a claim of evidentiary insufficiency, the

---

[17] As noted, the report states only that there were deletions from the DVD that it analyzed. (Report at 10).

petitioner must demonstrate that the prosecutor's case was so deficient that even if the evidence is viewed "in the light most favorable to the prosecution, [no] reasonable juror could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See id. at 324. In undertaking this assessment, the court must "defer to the jury's assessment of the witness's credibility". United States v. Arena, 180 F.3d 380, 391 (2d Cir. 1999)(citing cases). This standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that the jurors draw reasonable inferences from basic facts to ultimate facts." Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012). See, e.g., Santone v. Fischer, 689 F.3d 138, 148 (2d Cir. 2012). Moreover, in view of the statutory limitation on habeas review of state-court merits decisions, see 28 U.S.C. § 2254(d)(1), "a federal court may not overturn a state court decision rejecting a sufficiency of evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." Coleman, 132 S.Ct. at 2062.[18]

---

[18] In this case, although the Appellate Division held that the evidentiary-insufficiency claim was unpreserved, it also implicitly found the claim to be groundless since it held in the alternative that the conviction was not against the weight of the

In this case the evidence was more than sufficient to permit the jury to convict petitioner of facilitating the January 2005 sale. The State presented abundant testimony from cooperating witnesses as to Council's substantial role in carrying out the business of the drug trafficking organization, including direct sales of crack cocaine, attendance at sales by others in the organization and occasional involvement in acts of violence that could be viewed as a part of the organization's approach to enforcing its sales turf. (E.g., Tr. 2654-55, 2664-65, 2683-85, 2783-84, 2793-95, 2800, 2855-56, 2867, 2953-56; see State Br. at 5; see also pp. 59-61, infra). Indeed, on petitioner's direct appeal he did not dispute the weight of the evidence involving his participation in the drug business of this organization, but rather focused on whether the evidence justified the conclusion of the trial judge on sentencing that he was a co-leader of the group with his co-defendant Javier. (Deft's Br. at 7-12).

As for the specifics of the January 12 sale, eyewitnesses testified that Council's co-defendant Javier had directly sold 80 grams of crack cocaine to an undercover detective in a parking lot, a transaction that the undercover had previously arranged with

---

evidence. Council, 98 A.D.3d at 917-18, 951 N.Y.S.2d at 150.

Javier by telephone. (Tr. 453, 521-23, 548-50, 573, 641-42, 735-37, 854). The undercover and an accompanying police detective, who was playing the role of the undercover's "bodyguard", arrived by car at the lot (Tr. 641-42, 717, 847-48, 854, 1112), and some time later Council and another man drove into the lot and parked a short distance away, estimated at either 15 to 18 feet or four or five car lengths, and then remained in the car. (Tr. 438-41, 447-48, 454-62, 642-43, 849-52, 1115-18, 1134-36, 1718-19), According to the police witnesses, "a few seconds later", Javier walked into the lot, accompanied by two other men, one of whom appeared to be holding a gun. (Tr. 643-44, 660, 861-62, 1118, 1120-21, 1126, 1136, 1719-24). As described by the witnesses, during the course of the interchange Javier manifested a great deal of caution and suspicion about the <u>bona fides</u> at least of the detective who was playing the role of the undercover's bodyguard. The cited behavior included Javier being accompanied by the two other men, and at one point demanding that the undercover's "bodyguard", who was holding a gun, get back in his car -- a demand that the undercover rejected. (Tr. 644-45, 726, 1118-19). Javier nonetheless entered the undercover's car and remarked that the "bodyguard" looked "mad suspect". (Tr. 439-40, 450, 645, 1120, 1123, 1132, 1138-39). He then handed over the drugs to the undercover in exchange for $2,500.00 in cash. (Tr. 645-56, 1132-33). As he left the car, he told the undercover "Don't bring

35

that nigga no more." (Tr. 645, 1124, 1140). As testified by the witnesses, the entire transaction was very tense -- indeed the undercover was holding a concealed firearm during the interchange (Tr. 644, 1120) -- and was unusual because it was the first time that Javier had brought anyone else to a sale with the undercover. (Tr. 646-47, 859). This transaction was also the last purchase in which the undercover engaged with Javier. (Tr. 656, 710-12, 724-25).

As the Appellate Division observed, given this evidence the jury was certainly free to infer that petitioner's presence in the parking lot at the precise time of the planned sale was no coincidence, and that he was there by design to give Javier protection at a point when that defendant was manifesting considerable nervousness about the reliability of the buyer with whom he was dealing. Council, 98 A.D.3d at 917-18, 951 N.Y.S.2d at 150 ("the jury could reasonably have inferred, from all the surrounding circumstances, that defendant was not merely present at the sale in question, but that his role was to provide security and deter the buyer from attempting to take the drugs by force."). That line of reasoning was surely sufficiently plausible to sustain the conviction on this count in the face of petitioner's constitutional challenge.

3. <u>Evidentiary Sufficiency: the September 27, 2004 Sale</u>

In Council's petition he also challenges the sufficiency of the evidence on which his conviction for a sale on September 27, 2004 was based. Respondent argues that this claim was unexhausted and is procedurally barred. He also asserts that it is meritless. He is correct on both points.

On petitioner's appeal, he never challenged the sufficiency of the evidence as to this conviction. This omission represents a failure by him to exhaust his state-court remedies, in contravention of the statutory requirement that mandates such exhaustion. 28 U.S.C. § 2254(b)(1). That provision requires exhaustion of "available" state-court remedies, but at this stage Council has none. He may not pursue a second direct appeal from his conviction, <u>see</u>, <u>e.g.</u>, <u>Jimenez</u>, 458 F.3d at 149, and he cannot pursue an evidentiary-insufficiency claim by a collateral challenge since the pertinent statute precludes the trial court from addressing a claim that could have been raised on direct appeal, N.Y. Crim. Proc. L. 440.10(2)(a), <u>see</u>, <u>e.g.</u>, <u>Bennett</u>, 531 U.S. at 10-11 (court "must deny" claims that "could have been raised on direct appeal but were not"), a category into which petitioner's evidentiary claim plainly fits. <u>See</u>, <u>e.g.</u>, <u>Williams</u>, 2011 WL 2175810 at *9.

37

In the absence of a still-available state-court remedy, petitioner's claim must be assessed under procedural-bar standards. See, e.g., McKethan v. Mantello, 292 F.3d 119, 122 (2d Cir. 2002)(citing Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991)). So judged, the claim is barred from habeas review. Petitioner offers no excuse for not asserting the claim on appeal -- other than presumably the judgment of appellate counsel that it was not viable -- and hence he cannot demonstrate cause. He also fails to proffer any basis that would permit a finding that a refusal by this court to address the claim on its merits would constitute a fundamental miscarriage of justice. Although he makes an assertion that he is actually innocent (whether of this charge or another count of conviction is not clear), his only proffer of new information is the forensic report concerning the DVD -- and that report, even if we assume it concerns a copy of a video of the September 27 drug sale, does not constitute evidence of innocence, much less sufficient reliable evidence to demonstrate that no reasonable juror would convict Council on the sale charge.[19]

In any event, the underlying assertion of insufficient evidence

---

[19] As noted, the report states only that the DVD that the laboratory examined was a copy and contained deletions. (Report at 8-10).

on this count is plainly meritless. The State called both an undercover officer and a cooperating co-conspirator (Freddie Knox), who testified to their participation in the purchase of more than two ounces of crack cocaine directly from Council on September 27, 2004, a transaction that was initiated through his co-defendant Javier. (Tr. 603-08, 551-55, 619, 914-18, 1030-33). The DVD at issue presumably contained videotape of the encounter, which was filmed by a police detective. The eyewitness testimony of the undercover, a second officer and the cooperator -- even without the DVD -- was obviously sufficient to justify Council's conviction.

In short, this claim is both unexhausted and procedurally barred, and it is also completely groundless.

4. <u>Sufficiency of the Evidence of the Conspiracy Count</u>

At one point in Council's petition, he appears to imply that his conviction on the conspiracy charge is also vulnerable for lack of sufficient evidence. Thus he argues that his alleged participation in the conspiracy was premised on two overt acts, specifically, the sales on September 27, 2004 and January 12, 2005. Since he contends that his guilt on neither sale was proven beyond a reasonable doubt, he appears to suggest that his conviction for

conspiracy should also be vacated. (Pet. at 27-29).

Since petitioner never asserted this theory on his direct appeal, the claim is unexhausted, and, for reasons already noted with respect to the sale charges, it is also procedurally barred. Finally, since his attack on the sufficiency of the evidence for the sale convictions is plainly meritless, it follows that his apparent challenge to the conspiracy conviction is equally groundless.

5. <u>The Discharge of a Juror</u>

Petitioner next complains of the discharge by the trial judge of one of the jurors. His argument is that he was denied his due-process rights because the judge did so without giving defense counsel a chance to be heard on the decision. Respondent urges that the claim is procedurally barred and in any event meritless. Respondent is correct.

During the trial the judge advised the parties that one of the jurors, a Mr. Ferreiras, had asked to speak to the court because his employer was refusing to pay him for the balance of his jury service. (Tr. 1239-40). The juror then met with the judge, in the presence of the attorneys, and reported that he worked for a hotel

and that the company refused to pay him for more than two weeks of juror service -- a rule of which he had previously been unaware -- and that this pay period had already expired. Mr. Ferreiras explained that he financially supported both his mother and his son, with whom he lived, and that he could not meet the bills without his regular income. (Tr. 1240-42). He added that he had no other possible sources of financial support, and that this situation, if unresolved, would "affect [his] ability to concentrate and decide the case on the evidence and under the law." (Tr. 1242).

The juror then stepped out of the room and the judge consulted all counsel. Council's attorney asked whether the judge would contact the employer, and the judge agreed to do so, although he also observed that the employer was not legally obligated to pay the juror for more than two weeks of absence. (Tr. 1242-43). The attorney responded that he was not expecting the employer to relent, and he estimated that the trial would continue for about two more weeks, an estimate with which other counsel agreed. (Tr. 1243). The judge also remarked that he wanted to avoid getting the juror in trouble with his employer, a point that one of the defense attorneys then seconded. (Tr. 1243-44).

The judge then asked the juror for the employer's contact

information, and after a break he informed counsel that his clerk had contacted the hotel, and that management advised that it would decline to pay the juror anything more, citing the governing collective bargaining agreement. (Tr. 1245). The court asked whether the attorneys wished to be heard. The prosecutor asked to be allowed to do some legal research and trailed off by suggesting that the decision could be made the next day. The court said that that was "fine" but noted that there was "clearly financial hardship", that Ferreiras was working only in the cleaning department, and that it was unclear whether he would be paid even if he showed up that day for work. (Tr. 1245). The attorney for Javier requested that the juror be asked to stay "until at least after lunch." (Tr. 1245). Council's attorney said nothing.

The juror remained until the end of the trial day. At that point the court asked him to stay behind (Tr. 1447) and called the attorneys to the bench for an off-the-record conversation that was plainly about what to do with regard to the juror. (Tr. 1447-48).[20] After the bench conference the judge stated that the juror "need[ed his] weekly" salary to "live on", and that he regretted being unable

---

[20] Indeed, counsel for defendant Wilson remarked after the conference, "I said at the bench I'm not in opposition" to discharging the juror. (Tr. 1449).

to persuade the employer to be more accommodating, and he then discharged Mr. Ferreiras. (Tr. 1448). The court then said to the attorneys, "If anyone wants to be heard, please say what you'd like to say now." (Tr. 1449). The attorney for Javier then stated that he "oppose[d]" the juror's discharge, and counsel for Council and Pequero "join[ed]" that objection. (Id.). The other defense counsel either took no position or declined to object, and the prosecutor, observing that the juror had already been discharged, noted that the court had the authority to discharge him. (Id.). The judge then added that Ferreiras had no one else to assist with family finances, that without his salary he could not pay the rent or other expenses, that continued service would be a "real financial hardship" and that under the circumstances the court had "no choice" but to replace him with an alternate. (Tr.  1449-50). As it turned out, the trial continued for another four weeks. (Tr. 3999-4000).

Petitioner's current claim -- insofar as it mirrors the claim he asserted on his direct appeal -- is not that the discharge was constitutional error, or indeed any error, but rather that the judge had impermissibly denied his attorney an opportunity to be heard before the discharge was ordered. (Deft's Br. at 30-35; Pet. at 2-3, 29-30). That assertion parallels the claim that he asserted on his direct appeal in state court. In response to that claim, the State

argued on the appeal that his claim was unpreserved (State Br. 48), and the panel agreed and declined to review it in the interest of justice. Council, 98 A.D.3d at 918, 951 N.Y.S.2d at 151.

This scenario again triggers procedural-bar analysis. The ruling by the Appellate Division rested on an independent state-law ground, and that ground was certainly consistent with prevailing precedent under N.Y. Crim. Proc. L. § 470.05, which mandates a specific objection by the defendant at the time of the ruling. See, e.g., People v. Hicks, 6 N.Y.3d 737, 739, 810 N.Y.S.2d 396, 398 (2005); People v. Nettles, 88 A.D.3d 492, 493, 931 N.Y.S.2d 16, 17 (1st Dep't 2011). In this case, counsel for the petitioner did not articulate an objection to the purported failure of the trial judge to consult with him before discharging the juror; indeed, none of the defense attorneys made such an objection. While Council's attorney joined in an objection by the lawyer for Javier, that objection was plainly to the decision to discharge the juror, not to the purported failure of the judge to consult the attorneys. Indeed, this is not surprising, since the record confirms that the judge consulted counsel several times before discharging the juror.

The record is equally silent as to any cause than might justify the failure of the trial attorney to preserve the procedural

44

objection that petitioner now voices. Council also fails to present any basis for invoking the exception for "a fundamental miscarriage of justice." In short, the claim is procedurally barred from review.

In any event, Council's complaint is clearly meritless. The petitioner is asserting what amounts to a claim under state law -- specifically, N.Y. Crim. Proc. L. § 270.35(2)(b), which requires the court to "afford the parties an opportunity to be heard before discharging a juror". That right is not of constitutional dimension, and thus cannot trigger habeas relief. See, e.g., Estelle v. McGuire, 502 U.S. 62, 68 (1991). Moreover, the record reflects, as noted, that the judge did give the parties an opportunity to be heard, and then concluded, quite permissibly, that the juror was facing a severe financial hardship and must be discharged.

Finally, we note that no constitutional claim can arise from the substitution of one juror for another unless the petitioner can demonstrate that the replacement juror was biased or otherwise unfit to serve. See, e.g., United States v. Hamed, 259 F. Appx. 377, 378 (2d Cir. 2008); United States v. Gambino, 951 F.2d 498, 503 (2d Cir. 1991); Sutton v. Conway, 2010 WL 744417, *9 (E.D.N.Y. March 2, 2010); Wheeler v. Phillips, 2006 WL 2357973, *6 (E.D.N.Y. Aug. 15, 2006). Moreover, the law is plain that the trial judge may

45

substitute one juror for another for reasonable cause, and does not need the parties' consent. See, e.g., Sutton, 2010 WL 744417 at *9 (quoting United States v. Floyd, 496 F.2d 982, 990 (2d Cir. 1974)).

In this case the record makes plain that the trial judge had the discretion to excuse the juror for financial hardship. The record is also bare of any contention, much less evidence, that the alternate juror who replaced Mr. Ferreiras was biased or otherwise unfit to serve. Accordingly, apart from being procedurally barred, the claim is meritless.

6. The Questioning of the Foreperson & Judicial Bias

Petitioner next argues that he was denied a fair trial because the trial judge questioned the foreperson, Ms. Mejia, on three occasions during the trial, and supposedly did so in an abrasive and intimidating manner. Council further argues that this behavior was part of a pattern in which the trial judge manifested bias against petitioner in front of the jury, denying him "a fair and impartial trial". (Pet. at 29)(citing Sinclair v. United States, 279 U.S. 749, 765 (1929)). As he describes this pattern: "The trial court actually made objections for the People of the State of New York, became an advocate for the People's case, intimidated jurors, allowed into the

46

record inadmissible and prejudicial evidence, and tampered with the trial record that recorded the trial court's bias -- actually organized the correction officers' confiscation of trial transcripts that recorded the trial court's comment in front of the jury that petitioner and his co-defendants 'had no rights'". (Id.).

Respondent addresses only that portion of petitioner's argument that concerns the questioning of the foreperson. Nonetheless, we note that Mr. Council's remaining commentary on the performance of the trial judge, insofar as it assertedly reflected bias, was never mentioned in petitioner's two briefs to the Appellate Division. Thus his general argument about judicial bias was not exhausted, and may be deemed procedurally barred.[21] In any event, he fails to cite any specifics, much less refer to the trial record, and thus his pleading is manifestly inadequate to state even a colorable claim of judicial bias based on his conclusory allegations. We therefore focus solely on the one specifically pled and exhausted portion of the claim, which cited the judge's three rounds of questions posed

_____

[21] Although respondent did not assert an exhaustion defense to this part of the claim, the relevant statutory provision states: "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). See, e.g., Day v. McDonough, 547 U.S. 198, 206 & n.4 (2006)(discussing Granberry v. Greer, 481 U.S. 129 (1987)).

to the foreperson.

We first summarize the three instances targeted by petitioner and then address the merits of the claim.

a. <u>First Colloquy</u>. During the course of the trial, the prosecutor advised the court that a testifying undercover officer had observed defendant Pequero making gestures, including sticking out his tongue, and mouthing words -- possibly "I love you or something more graphic" -- to the foreperson, and the foreperson responding. (Tr. 798-99). The judge asked the court staff whether they had seen anything, and a court officer reported seeing "unusual behavior" from the foreperson, specifically that she had been "gazing" at Pequero and exchanging smiles with him. (Tr. 800). The officer reported also finding a note on the defense table where Pequero had been sitting, and it read "Why all the chicks on the jury feeling you". (Tr. 800-01). The judge also noted that Pequero had been "smiling, gestur[ing]" and "placing his hand over his face" when the jury entered and left the courtroom. (Tr. 806).

The prosecutor asked the court to "tact[fully] raise the issue with Ms. Mejia. (Tr. 808). Over defense counsel's objections, she agreed to do so, noting that "flirtation[]" between a juror and a

defendant was a "very serious mattter". (Tr. 801, 804-05).

The judge brought Ms. Mejia in, greeted her and asked her a few questions. She first asked the foreperson whether she had seen "any defendant . . . trying to make contact with you through his eyes or hand gestures or smiling or anything like that". The juror responded "[n]ot that I know of." The court then asked whether the juror herself had smiled or waved "or anything like that" at any of the defendants, and she denied doing so. Finally, the court asked whether Ms. Mejia was then smiling because she was "nervous", and the juror said that she was. (Tr. 809-10). The juror was then excused, and the judge observed that her behavior could be attributed to nervousness and that there was no basis to discharge her. (Tr. 812-14).

b. Second Colloquy. Just before summations, the judge informed counsel that, late in the prior week, Ms. Mejia had advised a court officer that she had airline tickets for the next week. (Tr. 3275). The juror was brought to the robing room and informed the court and counsel that she had a ticket to fly to Miami on Thursday of that week and to return on Sunday and that she had bought the ticket before the trial started in order to visit an ill grandmother. (Tr. 3276-78). The judge noted that Ms. Mejia had not mentioned this

49

during voir dire and that she should have done so, but Ms. Mejia observed that at the time the trial had been projected to end before her scheduled trip. (Tr. 3276-77). The judge then noted that she had told the jury that deliberations could last between two and ten days, and she then asked Mejia whether, if she could not go on the trip, she could undertake "full consideration of the case and give us a fair and just verdict based on the evidence." At that point Ms. Mejia said "I don't know." (Tr. 3277-78). The judge then asked Ms. Mejia to try to change her ticket, noting that the schedule of the trial could not be altered to suit Ms. Mejia's convenience -- "there's a lot of people involved in this situation" -- and the juror agreed to attempt to do so. (Tr. 3279-80).

The judge then excused Ms. Mejia and asked the lawyers whether they would consent to discharging her. Counsel for Council and Pequero declined to consent. (Tr. 3279-80).

The next day the judge asked the juror whether she had been able to confirm that she could change the ticket, and she responded that it would be feasible if she paid a fee. The judge then asked her whether, given the request of the court for her to make the change, she would "still be able to be a fair and impartial juror[.] You're not going to hold it against either side in your

deliberations?", and Ms. Mejia responded "No." (Tr. 3633-34). The judge then asked "You're going to decide the case on the [e]vidence only and the law?" The record indicates that Ms. Mejia shook her head affirmatively. (Tr. 3634). The court followed by asking whether she "wouldn't be upset to the extent that it will affect your ability to be a fair juror?", and Ms. Mejia responded "No". Finally the judge asked whether her grandmother's illness upset her, and the juror responded that it did but that "it's not such a big deal" and also confirmed that she could "give [the case her] full attention and decide the case on the evidence an[d] the law." (Tr. 3635).

c. Third Colloquy. During a break in the summations, the prosecutor advised the court that he had learned that Ms. Mejia resided "extremely close" to the Douglass Houses, which was the location of the activity that formed the basis for the charges on trial. (Tr. 3644, 3646, 3650). He further observed that her building was so close by that it appeared in one of the crime-scene photos and a diagram, and that she was living virtually across the street from the location of one of the charged murders. He further noted that Ms. Mejia had not mentioned her proximity to the crime scene during jury selection, and that she necessarily had repeatedly violated the court's admonition to the jurors not to visit any crime scene. (Tr. 3644, 3649-51). He also represented that Ms. Mejia lived

51

with her mother and that between 2000 and 2003 four different inmates had called one of the four telephones in that apartment, leaving open a question as to whether the juror had any incarcerated family members. He therefore asked the judge to question her. (Tr. 3644-54).

Defense counsel objected. In doing so, they stated that Ms. Mejia had not been asked her address during voir dire. They also complained that the judge had been unduly brusque with the jurors during the trial, and they suggested that questioning Ms. Mejia would only frighten her. (Tr. 3656-57, 3659, 3661).

The judge noted that in her experience potential jurors who lived near a crime scene would mention that fact, and if specific addresses were referred to at trial, the jurors would let the court know of their familiarity with the neighborhood. (Tr. 3654-55, 3659-60). In any case the judge chose to question Ms. Mejia.

The juror said that she thought that she had mentioned her address during jury selection. When asked whether she goes through the area where the crimes were alleged to have taken place, she stated that she did not because she lives on Central Park West and had no reason "to go over there", apparently referring to Amsterdam

or Columbus Avenues. (Tr. 3664-65). She was then excused, and the court ruled that it would not discharge her. (Tr. 3665, 3667-68, 3749).


    d. <u>Assessment</u>.


The precise legal theory underpinning petitioner's complaint about the questioning of Ms. Mejia is unclear. In his briefing in the Appellate Division he alluded to a New York statutory provision governing "when a sitting juror may be removed or excused while establishing a discre[te] process for investigating alleged improprieties." (Deft's Br. at 35 (citing N.Y. Crim. Proc L. § 270.35)). We infer that he is currently asserting a Due Process violation based on a contention either that the judge evinced bias when interrogating the foreperson or that her inquiries in some way denied petitioner an unbiased jury.


In addressing this issue, the Appellate Division held that the three inquiries of Ms. Mejia "did not deprive defendant of a fair trial." As found by the panel, "[t]he repeated inquiries were necessary because three separate issues arose during the trial as to the foreperson's ability to serve as a fair and impartial juror. We do not find that the repeated questioning was intimidating, or

that it caused defendant any prejudice." Council, 98 A.D.3d at 918, 951 N.Y.S.2d at 150-51.

We assume for present purposes that if a judge deals improperly with a juror in a manner that may interfere with that juror's ability to render a fair verdict, a defendant may have a basis for a due-process claim predicated on the denial of an unbiased jury and hence the failure to provide a fundamentally fair trial. That said, the record here does not remotely suggest such a scenario. Moreover, the findings of the Appellate Division in this respect are plainly reasonable and its holding obviously does not contravene or unreasonably apply Supreme Court precedent.

As the panel noted, three separate issues arose as to the foreperson's behavior and possible exposure to information that should not have reached the jury. In each instance, the trial judge handled the matter appropriately.

The fact that a number of observers, including not only the witness, but a court officer and the judge, all noted what appeared to be some interaction, possibly flirtatious, between the juror and one of the defendants was a cause for concern and triggered a need for an inquiry. Moreover, the judge proceeded in a cautious, brief

and circumspect manner in questioning the juror, and plainly did not act out of bias or in a manner that would likely intimidate the juror, even if she was a fairly fragile or nervous individual.

As for the juror's scheduling conflict, it arose in the midst of the trial and presented a potentially serious difficulty for the court in keeping the trial on track. Inded, New York law prohibits suspending jury deliberations for more than 24 hours at a time, thus precluding a longer break to accommodate this juror's absence for several days of available trial time. See N.Y. Crim. Proc. § 310.10(2). In short, the judge was certainly justified in following up on the juror's belated message to the court officer posing that conflict as the trial was taking longer than expected. Moreover, although the judge was mildly, and briefly, critical of the juror's failure to mention this problem earlier in the process, she handled the brief questioning in a neutral and non-confrontational way, and elicited from the juror a willingness to rearrange her flight plans. The court was also careful to elicit from the juror a series of assurances that the need to change her ticket and her concerns about her grandmother would not interfere with her ability to render a fair and impartial verdict. Again, there is no indication in the process of any judicial bias or any intimidation or potential for swaying the juror in her deliberations.

55

Finally, the third round of questioning, elicited by the prosecutor's report that Ms. Mejia was living in virtually the shadow of the crime scene, offers no hint of judicial bias nor does it suggest that the juror was in any way going to be influenced in her assessment of the case by the court's posing of a few questions concerning where she lived and whether she had been passing through the scene of much of the alleged gang activity that was the subject of the trial. It is also obvious that the court was fully justified in seeking such assurances. It is an obligation of the judge to prevent any taint of the jurors and, if that has occurred, to find it and take appropriate remedial measures. That is all that the judge did in this instance.

The trial judge necessarily has broad discretion in handling the jury with an eye to ensuring an unbiased outcome of the case. See, e.g., United States v. Aiello, 771 F.2d 621, 629 (2d Cir., 1985). See generally United States v. Parker, 903 F.2d 91, 101 (2d Cir. 1990). In this case the record reflects that Justice Wittner acted properly in that regard in her dealings with the foreperson, and in any case the findings of the appellate court as to the necessity for such inquiries and the lack of any resulting prejudice are plainly reasonable.

In sum, this claim is meritless.


7. <u>Denial of Severence</u>


Prior to trial, Council sought to sever violence-related counts against co-defendant Pequero. He argued that there was no evidence that these acts were committed in furtherance of the conspiracy. That motion was denied by Justice Solomon on the basis that the indictment charged these events as overt acts in furtherance of the conspiracy, an allegation that the prosecutor represented would be borne out by the evidence at trial. (Deft's Br. at 4). Petitioner renewed the motion at the close of voir dire, but it was denied. (<u>Id.</u>).


On appeal petitioner pursued the same argument, asserting that he had been prejudiced by the joint trial. In doing so, he pressed the argument that, under New York caselaw, "constitutional error" in joinder mandates reversal "'if there is a *reasonable possibility* that the error *might* have contributed to the conviction'" and that "non-constitutional error is presumed prejudicial and requires reversal unless the People prove the evidence was 'overwhelming' and there is no significant probability the jury would have acquitted the defendant absent the error". (Deft's Br. at 46 (quoting & citing

People v. Crimmins, 36 N.Y.2d 230, 240-42 (1975))(emphasis added in defendant's brief). Petitioner went on to emphasize his contention that the prosecutor had failed to demonstrate a link between the targeted violent acts and the drug conspiracy, and he asserted that he had been prejudiced by the spillover of the murder-related evidence insofar as the jury had convicted him on the two drug-sale counts, contending that the evidence on those two charges -- even if constitutionally sufficient -- was quite weak. (Id. at 46-49).

In opposing this argument, the State pointed to the substantial trial evidence that linked the various acts of violence by co-defendant Pequero to the conspiracy. (State Br. at 41-46). We summarize a few examples.

Thus, in early August 2001 a rival drug dealer was selling in turf that the Douglass Houses gang deemed their own. According to a cooperating witness, Efrain Gonzalez, Council stated that this dealer -- known by the sobriquet "Gorilla" -- was "asking for it". (Tr. 2705). On August 6 Gorilla and two other men -- one named Tyrell Williams -- approached another dealer, named Reynaldo Mojica[22], and Gorilla threatened him with a gun for selling in the

_____

[22] Like Gonzalez, Mojica was identified in the indictment as a co-conspirator and later pled to conspiracy, drawing a prison

58

same neighborhood. (Tr. 2166-67, 2246-51). Mojica reported this threat to his supplier, Calvin Brown, who relayed the news to Pequero (Tr. 2168-70, 2243-46, 2249-54), and that worthy responded by muttering about "doing something" and then spoke by telephone to Council for several minutes. (Tr. 2706-08, 2898-99). As Mojica testified, shortly thereafter, Pequero searched for, located and murdered Williams. (Tr. 2167-78, 2194-96, 2207, 2254-65, 2268-77, 2284-85). This sequence of events surely permitted the jury to infer both that the killing was designed to enforce the turf claims of the Douglass Houses gang and that Council had approved the shooting.

As another example, only two days later, on August 8, Gonzalez was selling drugs in the same neighborhood and was approached by a large group of rival dealers, including a man named Andre and an Al "Macho" Cruz. Andre warned Gonzalez not to sell there. (Tr. 2712-13, 2716, 2792, 2905-08). This encounter led to an argument between Gonzalez and Cruz that was witnessed by Council. (Tr. 2713-16, 2917-19). He and Gonzalez then walked together and soon again encountered Andre and his cohorts. At that point, Council quickly became embroiled in a fight with one of the men, named Howie Stokes. (Tr. 2717-22, 2912, 2914, 2918, 2920, 2923). In the wake of that

---

sentence of twelve years, and testified for the State at the trial. (Deft's Br. at 3 n.1; Tr. 2150-2285).

altercation, Gonzales and Council drove to several locations in search of a gun. (Tr. 2716, 2807, 2846, 2914, 2926, 2932-37). At some point they were joined by Pequero, who asked for the details of the fight between Council and Stokes. (Tr. 2717-19, 2724-25, 2938-39). Pequero and Gonzalez, and possibly Council, then started walking to 104th Street, though Gonzalez stopped because he was unarmed. Pequero continued to Columbus Avenue, where he encountered Al Cruz talking with another man, at which point Pequero pulled a gun and fired repeatedly at Cruz, fatally wounding him. (Tr. 2718, 2725-31, 2939; see also Tr. 1152-64, 1221-26, 1424-29, 1634-42, 1674, 1709-11, 1777-78, 1828, 2032-38, 2092-101).  Again, this evidence obviously permitted the jury to infer that this killing was related to the drug gang's turf wars.

Having reviewed this and other evidence of violent conduct by various of the defendants, the panel rejected Council's severance argument on the merits. In doing so, it found specifically that the evidence of violent misdeeds "was admissible against defendant and necessary to prove conspiracy." Moreover, it rejected Council's contention that the trial evidence had contradicted the State's stated theory that the acts in question were a part of the ongoing conspiracy. Council, 98 A.D.3d at 918, 951 N.Y.S.2d at 151. This ruling is unassailable.

60

Both federal and state rules of practice favor the joinder of charges and of defendants where the defendants have been accused of acting jointly, because "consolidated prosecutions 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bring those accused of crimes to trial.'" Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993)(quoting Bruton v. United States, 391 U.S. 123, 124 (1968)). See, e.g., Zafiro v. United States, 506 U.S. 534, 537, 539 (1993). Accord, e.g., People v. Hitel, 180 A.D.2d 820, 821, 581 N.Y.S.2d 801, 802 (2d Dep't 1992) (quoting People v. Cardwell, 78 N.Y.2d 996, 997, 575 N.Y.S.2d 267 (1991)). Consistent with this policy, a denial of severance will trigger due-process concerns only if it appears that the joint trial actually denied the defendant a fundamentally fair proceeding. See Herring, 11 F.3d at 377. Since the trial courts typically have the means to avoid real prejudice in the context of a multi-defendant trial, the trial judge has broad discretion in assessing whether such a joint trial is appropriate. See, e.g., Zafiro, 506 U.S. at 539; United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998); Caldwell, 78 N.Y.2d at 997, 575 N.Y.S.2d at 267.

More specifically, the Second Circuit has held, in the context of trials in federal court, that "separate trials are required only upon a showing that "'"the jury, in order to believe the core of

testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant."'" Grant v. Hoke, 921 F.2d 28, 31 (2d Cir. 1990)(quoting inter alia United States v. Serpoosh, 919 F.2d 835, 838 (2d Cir. 1990)). As the Court observed in Grant -- which involved a habeas challenge to a state-court ruling -- "[a]t least as much must be shown when a federal habeas court reviews a state court denial of a severance motion." Id. (citing inter alia Willard v. Pearson, 823 F.2d 1141, 1149 (7th Cir. 1987)).[23] Accord, e.g., Anderson v. Lemke, 2015 WL 4104605, *13 (S.D.N.Y. July 6, 2015); Williams v. Moscicki, 2014 WL 1277400, *7 (E.D.N.Y. March 27, 2014); Garcia, 2010 WL 4104605 at *8.

In this case, as the appellate court found, there was compelling justification for the joint trial. All five trial defendants were charged with being, and were proven to be, part of the same drug-distribution network. The evidence against each of them was both substantial and fairly straightforward, involving the creation and operation of a narcotics-distribution organization, and the commission of a series of crimes -- including drug sales and

---

[23] It bears mention that Grant was decided before the enactment of AEDPA, which limited the scope of a habeas court's review of state-court decisions on the merits. See Garcia v. Artus, 2010 WL 1816333, *8 n.9 (E.D.N.Y. May 5, 2010).

murders -- committed to keep the business going. Although only Pequero was charged with the commission of murder and attempted murder, the indictment charged, and the evidence at trial permitted the jury to find, that those violent acts were committed in support of the business affairs of the organization. Moreover, petitioner was shown to have engaged in at least one non-fatal act of violence himself, and to have done so in circumstances demonstrating that he was acting in the course of territorial and other disputes between the organization and rival dealers. See p. 58-59, supra. He was also shown to have assisted co-defendants who were engaging or about to engage in fatal violence, again in a context that fully justified an inference that these acts were part of the organization's ongoing drug-dealing business. See pp. 57-59, supra.

We further note that the various defendants did not assert any antagonistic defenses or present antagonistic evidence. And although some of the evidence concerned crimes in which not all of the defendants were directly involved, that evidence was admissible against all of the defendants as alleged co-conpsirators, since it was relevant to the existence and contours of the conspiracy and since the conduct in question involved overt acts in furtherance of the conspiracy. See, e.g., People v. De Los Angeles, 270 A.D.2d 196, 197-98, 707 N.Y.S.2d 16, 20 (1st Dep't 2000); Council v. Connell,

63

2010 WL 1140879, *6 (S.D.N.Y. March 25, 2010), adopted, 2010 WL
2884746 (S.D.N.Y. July 20, 2010); see also United States v. Rosa,
11 F.3d 315, 341 (2d Cir. 1993)(citing cases).


Given these circumstances, denial of severance imposed no
meaningful prejudice on petitioner. The same evidence of violence
would have been admissible against him in a separate trial, as it
was relevant to the conspiracy charge. Moreover, the trial court
undertook adequate efforts to avoid juror confusion or unfairness,
emphasizing to the jury that the evidence must be weighed separately
against each defendant. (Tr. 3773). These efforts were apparently
successful, since there is no indication that the jurors were
confused or improperly influenced by the multiplicity of defendants
and the extent of the factual record presented to them. Indeed,
their deliberations were extended, continuing for the better part
of five days, and they submitted a number of notes, reflecting
careful consideration of the many charges and extensive evidence.
(Tr. 3854, 3860, 3877, 3880, 3885, 3895-96, 3897, 3903, 3905, 3910,
3915, 3918, 3924-25, 3933, 3939, 3947, 3954, 3962, 3966, 3967, 3984-
85). In addition the jurors clearly considered each defendant's role
separately, as evidenced by several of their notes (Tr. 3861,3880,
3910, 3915, 3954, 3966), and by the fact that they first reached
verdicts as to four of the defendants -- Javier, Council, Tyrone

64

Council and Wilson (Tr. 3969-78) -- and then separately reached verdicts the next day on Pequero. (Tr. 3992-99). Furthermore, the jurors chose to acquit Pequero on one of the murder charges -- thus reflecting careful, individualized consideration of each of the charges. Moreover, separate trials would have imposed a substantial burden on the state-court system, and there is no reason to believe that any separate trials would have been notably shorter or would have led to different results.

In sum, the decision of the trial court to refuse severance plainly did not lead to a fundamentally unfair trial for Council or any of his co-defendants. See People v. Council, 52 A.D.3d 222, 222, 859 N.Y.S.2d 152, 153 (2d Dep't 2008)(appeal of co-defendant Tyrone Council, who asserted the same argument). It equally follows that the Appellate Division's affirmance of the trial court's severance ruling was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Necessarily, then, his invocation of the Due Process Clause must be rejected.

8. <u>Sentencing</u>

Petitioner also complains about the length of his sentence. This argument also fails.

65

The length of a state defendant's sentence, if within statutory limits, is not ordinarily a matter of constitutional significance. See, e.g., White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam). Constitutional review of state sentencing decisions is generally limited to whether the sentence exceeded the statutory maximum, see, e.g., Jones v. Thomas, 491 U.S. 376, 381 (1989); whether the sentencing court relied upon constitutionally impermissible considerations, see, e.g., Alabama v. Smith, 490 U.S. 794, 798-800 (1989); Texas v. McCullough, 475 U.S. 134, 141-44 (1986); whether it relied upon materially incorrect information, see, e.g., Townsend v. Burke, 334 U.S. 736, 740-41 (1948); United States v. Malcolm, 432 F.2d 809, 815-16 (2d Cir. 1970); and whether the sentence violated the Ex Post Facto or Double Jeopardy clauses. See, e.g., Miller v. Florida, 482 U.S. 423, 431-33 (1987), abrogated on other grounds, Johnson v. United States, 529 U.S. 694 (2000); United States v. Meeks, 25 F.3d 1117, 1120 (2d Cir. 1994); Stewart v. Scully, 925 F.2d 58, 62 (2d Cir. 1991). The habeas court may also review whether a state sentence was "constitutionally disproportionate" in view of the facts of the case, but relief based on such a claim is "exceedingly rare" in non-capital cases. See, e.g., Ewing v. California, 538 U.S. 11, 21 (2003) (O'Connor, J.) (quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980)); Harmelin v. Michigan, 501 U.S. 957, 966 (1991) (Scalia, J.); Bethea v. Scully,

834 F.2d 257, 261 (2d Cir. 1987) (quoting United States v. Ortiz, 742 F.2d 712, 714 (2d Cir. 1984) (quoting Solem v. Helm, 463 U.S. 277, 290 n.16 (1983))).

We first note that the subject of petitioner's sentence is currently at issue on his 440.10 motion before the New York Supreme Court, although on that application he presses a statutory argument based on the 2005 amendment of the Rockefeller Drug Law. (440.10 Motion at 6, 35-36). In any event, since petitioner did challenge that sentence on his direct appeal and did so on the basis, in part, of Eighth Amendment jurisprudence, we address the merits here.

In this case petitioner received a sentence that was plainly within the state statutory range and has made no showing that his sentence was "constitutionally disproportionate" in light of the facts of the case, which involved large-scale organized dealing in crack cocaine and repeated instances of violence. Under New York's sentencing scheme, he faced potential sentences of twenty-five years to life for each of his two sale convictions and the conspiracy charge, and each of his three sentences could have been consecutive. (See State Br. at 75); see also People v. Brown, 80 N.Y.2d 361, 363-64, 590 N.S.2d 422, 423-24 (1992)(discussing N.Y. Penal L. § 70.25(2)); People v. Scott, 129 A.D.3d 1306, 1309, 12 N.Y.S.3d 335,

338 (3rd Dep't 2015). Instead, Justice Wittner sentenced him to two consecutive terms of fifteen years to life and a concurrent term of 8 1/3 to 25 years on the conspiracy charge. Moreover, since he was already serving a term of four to twelve years for another narcotics sale, the court could have ordered his sentences on the current convictions to run consecutively to that earlier sentence, see, e.g., People v. Taylor, 116 A.D.3d 1120, 1121-22, 4 N.Y.S.3d 743, 745 (3rd Dep't 2015), and yet she specified that the prison terms that she did impose were to be concurrent with the preexisting sentence.

Finally, to the extent that petitioner argues that he was not the leader of the drug-dealing organization, he appears implicitly to be arguing that the sentencing court relied on materially incorrect information. The short answer is that the trial judge was certainly permitted to draw reasonable inferences from the evidence at trial, and petitioner does not demonstrate that the findings of the state courts -- both the trial court and, implicitly, the Appellate Division -- as to his role were unreasonable in view of the record before them.[24]

---

[24] As just two examples, we note the evidence that, before killing Pharell Williams, Pequero apparently consulted Council, and that in the wake of Gonzalez's encounter with rival dealers, Council accompanied Gonzalez in a search for a gun, an effort

In sum, the reasoning of the sentencing court, endorsed by the Appellate Division, was not at all inconsistent with, or an unreasonable application of, Supreme Court precedent. Therefore, petitioner is not entitled to habeas relief on this claim.

CONCLUSION

For the foregoing reasons, we recommend that the writ be denied and the petition dismissed with prejudice. We further recommend that a certificate of appealability not issue since petition fails to present any issue worthy of appellate review.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable P. Kevin Castel, Room 2260, 500 Pearl Street, New York, New York 10007, and to the chambers of undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the

---

that culminated with Pequero killing Al Cruz.

District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636 (b) (1); Fed. R. Civ. P. 72, 6(a), 6(d).

**Dated: New York, New York**
      **September 24, 2015**

                              RESPECTFULLY SUBMITTED,

                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

**Copies of the foregoing have been sent today to:**

      Tony Council
      07A0976
      Sing Sing Correctional Facility
      354 Hunter Street
      Ossining, NY 10562
      PRO SE

      Lisa E. Fleischmann
      New York State Office of the Attorney General
      120 Broadway
      New York, NY 10271